UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ROBERT D. ALVIS,                    No. 2:07-cv-00984-MCE-DAD

      Plaintiff,

  v.                              MEMORANDUM AND ORDER

AT&T INTEGRATED DISABILITY
SERVICE CENTER; SEDGWICK CMS;
AT&T INCOME DISABILITY PLAN,

      Defendants.

----oo0oo----

    Plaintiff brought this action, arising under the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.
§ 1001, et seq., for the wrongful denial of short-term disability
("STD") benefits.  Presently before the Court are Plaintiff's
Motion to Amend or Clarify the Pretrial Scheduling Order and
Defendants' Motion for Summary Judgment.  For the following
reasons, Plaintiff's Motion is denied, and Defendants' Motion is
granted.[1]

/// 

---

   [1] Because oral argument will not be of material assistance,
the Court ordered this matter submitted on the briefing.  E.D.
Cal. Local Rule 78-230(h).

1

## 1.   AT&T Disability Income Plan

Plaintiff is a former employee of Pacific Bell Telephone Company, where he was a manager with sedentary job duties.  While employed, Plaintiff participated in an employee welfare benefit plan known as the "AT&T Income Disability Plan" (the "Plan").

The Plan was self-insured and administered by a third-party claims administrator ("TPA").  It contained the following terms relevant to the disposition of the parties' instant Motions:

> "Total Disability" or "Totally Disabled" means, with regard to Short Term Disability, that because of Illness or Injury, an Employee is unable to perform all of the essential functions of his job or another available job assigned by the Participating Company with the same full- or part-time classification for which the Employee is qualified.  Plan § 2.26.

> "Injury" shall mean job and non-job related trauma or damage to the physical person of an Employee medically substantiated and treated by a Physician which renders an Employee incapacitated from performing the duties of any job assigned by the Participating Company.  Plan § 2.12.

> Upon the written request of a claimant or his duly authorized representative, received by the Committee or the Claims Administrator or the subcommittee to whom claim review authority has been assigned not more than sixty (60) days after the date of mailing or delivery of written notice of denial of such claim, the Committee or the Claims Administrator or the delegated subcommittee, as applicable, is required to give such claimant or his authorized representative a full and fair review of the claim, the opportunity to review pertinent documents, and the opportunity to submit to the Committee or the Claims Administrator or the delegated subcommittee, as applicable, issues and comments in writing.  Id. § 5.5.2(a).

---

[2] The following recital of facts was primarily taken, sometimes verbatim, from Plaintiff's Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment. Additional facts derive from the administrative record.

Claim Decision-Making Authority: The Committee and each Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine the eligibility of any individual to participate in and receive benefits under the Plan.  The decision of the Committee or a Claims Administrator or any subcommittee, as applicable, on any claim, in accordance with the claim procedures set forth in this Subsection 5.5, shall be final and conclusive and shall not be subject to further review.  Id., § 5.5.4.

Information to be Furnished: Employees shall provide the Claims Administrator, the Plan Administrator, and/or the Participating Company with such information and evidence, and shall sign such documents, as reasonably may be requested from time to time, for the purpose of administration of the Plan.  Id. § 7.1.

Sedgwick Claims Management Services, Inc. ("Sedgwick"), was the TPA for the Plan and had no role in the Plan's funding. Sedgwick was not financially associated with the Plan and received a flat fee for its services, without regard to whether it approved or denied claims.  Employees of Sedgwick compromised both the AT&T Integrated Disability Service Center ("IDSC"), a unit of Sedgwick, and the Quality Review Unit ("QRU") of IDSC.

Once a claim for STD benefits was initiated, Sedgwick assigned to the claim a case manager responsible for determining initial eligibility and for contacting the employee and/or his treating doctors for necessary information.  Sedgwick also notified the employee as to whether his claim has been approved or denied, and, if approved, for what period of time.

///

///

///

///

3

Based on the language of Plan § 7.1, Defendants contend it was the employee's responsibility to ensure additional medical information was provided, as necessary, to allow the case manager to continue evaluating the STD benefits claim to determine whether to authorize STD benefits for an extended period of time.

Participants that disagreed with the TPA's initial decision regarding benefits had the option to file an appeal pursuant to the methods and procedures provided in the Plan. Upon a written appeal from denial of benefits, the Plan provided that the Claims Administrator must give the claimant a full and fair review of the claim, the opportunity to review pertinent documents, and the opportunity to submit issues and comments in writing.

The QRU reviewed appeals filed under the Plan. It evaluated those appeals based upon the information before the IDSC in making the initial decision to deny the claim, the issues and comments submitted by the participant employee, and such other evidence as the QRU may independently have discovered. The QRU was permitted to, and did, seek assistance from independent medical advisors in analyzing medical evidence.

**2.  Plaintiff's Original Claim**

On March 6, 2006, Plaintiff stopped reporting to work after allegedly experiencing numbness in his feet. On March 13, 2006, he submitted a claim to Sedgwick for STD benefits. IDSC acknowledged receipt of his claim via written correspondence.

///

///

The initial letter to Plaintiff provided the paperwork required for his claim and informed him that it was his responsibility to provide the necessary medical documentation substantiating his medical condition.

On March 21, 2006, IDSC sent Plaintiff a letter approving his benefits request from March 13, 2006, through April 2, 2006. However, on April 7, 2006, because no additional information had been received to support continued benefits, IDSC notified Plaintiff that his claim was denied effective April 3.

Subsequently, on April 11, 2006, IDSC received a faxed "Initial Physician Statement," dated March 27, and completed by Randall W. Armstrong, M.D., of Sacramento Knee & Sports Medicine, describing Plaintiff's then-current functional limitations as "can't bend/lift/stand." That same day, IDSC received a faxed copy of an "Initial Consultation" letter, also dated March 27, in which Dr. Armstrong recommended that Plaintiff undergo a CT mylegram to determine whether he had a disc herniation. Accordingly, on April 18, IDSC approved Plaintiff's claim for an extension of STD benefits through April 23. Plaintiff was subsequently approved for further extensions through July 23, 2006.

During the interim, Plaintiff had back surgery and, on July 27, 2006, Greg Rountree, an IDSC Disability Specialist, received from Plaintiff's treating physician, Dr. Gary A. Schneiderman, a fax containing progress notes dated July 6 and stating that Plaintiff's "pain has remitted, although he gets some occasional pain in his back. His leg pain has remitted completely.

He does have some persistent numbness that seems to radiate down the posterior aspect of the leg, like his leg is dead." The doctor elaborated, "He has excellent strength. Straight leg raise is negative to 60 degrees. He has decreased sensation over the dorsum of the left foot. The wound shows eschar in the midline. No inflammation."

On July 28, 2006, Mr. Rountree sent Plaintiff a letter notifying him that his claim for an extension of STD benefits had been approved through August 27, 2006. In that letter, Mr. Rountree explained to Plaintiff that if he was not sufficiently recovered to resume his job duties at the end of the approved period, updated medical information was due by August 22, 2006.

On August 24, having received no further medical information regarding Plaintiff's condition, Mr. Rountree called Dr. Schneiderman's office and left a message requesting updated work status, including any restrictions and exam findings to support those restrictions. That same day, Mr. Rountree left a message for Plaintiff stating that his benefits approval would expire on August 27, and that updated medical information was needed to support an extension.

On August 25, Mr. Rountree received a voicemail from Dr. Schneiderman's office stating that Plaintiff's last visit with Dr. Schneiderman had been on August 22, and that, on August 28 or 29, a dictation would be available, but would have to be requested from the medical records department.

///

///

Plaintiff also left a message for Mr. Rountree indicating that medical records from Dr. Schneiderman's office would not be available until August 30.

On August 28, Mr. Rountree called Dr. Schneiderman's medical records department and left a message requesting the dictation from August 22. The next day, Mr. Rountree called Plaintiff to advise that no medical records had been received.

Finally, on August 30, 2006, Mr. Rountree sent Plaintiff a letter notifying him that "after a careful and thorough review of [his] request for further payment of short term disability benefits..., it ha[d] been determined that [his] claim [did] not qualify for payment." Mr. Rountree provided those portions of the plan defining "total disability" and requiring employees to provide information and evidence as requested. The IDSC employee then stated that, because "[n]o additional information ha[d] been received to support continued disability benefits beyond August 26, 2006," STD benefits were denied effective August 28. Mr. Rountree advised Plaintiff that if he disagreed with the determination, he could appeal to the QRU. He also provided Plaintiff with the procedures to do so.

In that communication, Mr. Rountree made clear that "[i]n order to determine ongoing disability, AT&T Integrated Disability Service Center [would] need clear medical evidence that support[ed] a severe functional impairment or limitation that would give credence to [Plaintiff's] functional inability to perform [his] job or alternative job duties available to [him]."

///

///

Mr. Rountree advised that "[t]his information may be included in the following: chart or progress notes, specialist's evaluations, physical therapy notes, diagnostic test results, operative report(s), or any other medical information [Plaintiff felt] support[ed] [his] inability to work."

Lastly, Mr. Rountree explained, "You shall be provided, upon written request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits. ¶ 'Please note that your file may be supplemented after we respond to your request for relevant documents and such further information will be provided to you upon your future request(s).'"

Plaintiff subsequently submitted additional medical information to Mr. Rountree, including Dr. Schneiderman's August 22, 2006, progress notes, which stated, "His exam shows wound is well-healed. Straight leg raise is negative. Good strength...Follow-up in six weeks after concluding therapy. He remains temporary disabled until October 15, 2006." Plaintiff later faxed a "Physical Capacities Evaluation - Sedentary" form completed by Dr. Schneiderman, as well as the doctor's progress notes from September 21, 2006, which stated that "[o]n exam today, he appears to have good strength. Straight leg raise causes back pain, but no radicular symptoms...The patient has had a substantial flare in his back pain after undergoing physical therapy. He does not have radicular symptoms at this time."

///
///
///

After each communication, Mr. Rountree sent Plaintiff a letter informing him that the information received did not alter the previous denial decision, and that, to have such information considered, Plaintiff was required to submit an appeal to the QRU.

**3.    Plaintiff's Appeal to the QRU**

On November 15, 2006, Plaintiff filed a written appeal with the QRU, and, on November 19, 2006, Mr. Rountree received a letter dated November 3, from Phillip A. Cooke, Plaintiff's counsel, requesting Plaintiff's entire disability file.

On December 1, 2006, after at least two unsuccessful attempts to contact Mr. Cooke, Stephen Austin, an IDSC Disability Specialist, reached Plaintiff's counsel by phone and informed him regarding the appeal process and the finality of any decision. Mr. Austin also inquired as to whether all medical information had been submitted.  Mr. Cooke responded that he intended to review Plaintiff's file "before stating whether all medical has been submitted," but that he "[did] believe all medical has been submitted up to this point."

Several days later, on December 6, Mr. Austin spoke to Valerie at Mr. Cooke's office to follow-up as to whether Plaintiff planned to submit any additional medical information and to inquire as to whether Plaintiff wished to toll his appeal.
///
///
///

That same day, Mr. Austin received a fax from Mr. Cooke stating that Plaintiff had seen Dr. Schneiderman on November 14, and was waiting to be scheduled for a functional capacity evaluation ("FCE"). Nevertheless, according to Mr. Cooke, Plaintiff did not wish to delay the appeal by waiting for the results of that FCE.

On December 8, 2006, Valerie at Mr. Cooke's office again confirmed in a telephone conversation with Mr. Austin that "they [were] not submitting any additional medical documentation," that the QRU has all the information relating to Plaintiff, and that the QRU could proceed with the appeal.

On December 14, 2006, IDSC sent Mr. Cooke the requested copy of Plaintiff's claim file.

On December 28, 2006, Mr. Austin left a message for Valerie at Mr. Cooke's office to confirm once again that Plaintiff did not want to toll his appeal in order to include Plaintiff's "op report." Later that same day, Mr. Austin spoke with Valerie, who informed him not to toll the appeal, but that she would contact him the following day if she learned otherwise. Neither party alleges Plaintiff made any later attempts to toll the appeal or to submit additional medical information.

The QRU subsequently sought medical evaluations of Plaintiff's claim from independent physician advisors.

On January 3, 2007, a physician board certified in Physical Medicine and Rehabilitation, Dr. Saad M. Al-Shathir, M.D., completed a report for QRU, in which he concluded that "Mr. Alvis is not disabled from his regular job as of 8/28/06 through present."

///

Dr. Al-Shathir further determined, "[t]here are no clinical findings contained in the record provided that would impact his ability to function in his sedentary job." Additionally, Dr. Al-Shathir stated, "There are no documented disabling objective findings. On 8/22/06 his straight leg-raising test is negative with good strength. On 9/21/06 it is documented that he has some residual low back pain is insignificant since he is over all definitely improved and therapy was put on hold. It is not clear what the purpose or goals of therapy since he has no functional loss or documented inability to perform job duties to unable to function in any capacity." Finally, Dr. Al-Shathir explained that Plaintiff had an "uncomplicated lumber diskectomy with no documented loss of function, loss of ROM or neurological deficit. On 7/5/06 it is documented that his back pain is remitted completely. The reported PT, which eased his back pain, is put on hold. There is no documented clinical abnormality after 8/28/06 that would impact his ability to do sedentary job."

That same day, Dr. Michael J. Chmell, M.D., a licensed orthopedic surgeon, also completed a report for QRU, similarly concluding that "[t]his employee is not disabled from his regular job from 8/28/06 through the present." Dr. Chmell determined that there were "no clinical findings contained within the medical record, which would impact upon the employee's ability to function as of the date in question." Additionally, he stated that "the patient has no documented objective findings and in fact has documented normal neurologic status with no evidence of recurrent radiculopathy.

///

It is also documented that his physician has instituted restrictions due to his symptomatology rather than any objective findings."

According to Dr. Chmell, a review of the medical records revealed that Plaintiff's pain and his inability to perform his regular job were based on his subjective statements, and not supported by objective findings. Dr. Chmell also determined the office notes from Dr. Schneiderman did not provide objective documentation of a functional impairment severe enough to preclude Plaintiff's return to work. Dr. Chmell noted that Dr. Schneiderman provided no rationale for the selection of an October 15, 2006, return to work date, and he determined the restriction and return to work day were selected on a "pure arbitrary basis."

Dr. Chmell went on to conclude that the restrictions of "sitting, standing, or walking for only 10 minutes at a time," were also arbitrary. He stated, "There is no documentation of a functional impairment, which would cause the patient to be only able to sit, stand or walk for 10 minutes at a time. No objective testing is provided to support these restrictions nor is there anything in the peer reviewed orthopedic or spine literature, which would suggest the need for such restrictions now three months following uncomplicated discectomy. These restrictions illustrate the arbitrary nature by which this patient's restrictions are given largely related to subjective assessment of his pain and subjective assessment of functionality rather than any objective findings."
///

Dr. Chmell made similar conclusions regarding the restrictions of "keyboarding, utilizing the upper extremities only rarely and reaching with the upper extremities never." The doctor noted, "There is no documentation at any point in the medical record of any type of upper extremity impairment, which would necessitate upper extremity restrictions."

Thus, Dr. Chmell concluded, "As of 8/22/06, the patient is documented as having undergone a successful L5-S1 discectomy without complications. The patient is noted to have a healed incision with straight leg raising and good strength with no neurologic deficit and no evidence of recurrent radiculopathy. These findings support intact functionality sufficient enough to return to work duties on a full-time basis."

After reviewing the file, including the medical evaluations, Mr. Austin sent Plaintiff a letter informing him that his request for appeal had been reviewed and that the decision to deny benefits upheld. In that letter, Mr. Austin explained that in making its determination the QRU reviewed all of the material submitted by Plaintiff, all of the information that IDSC had regarding the denial of STD benefits, additional documents submitted during the pendency of his appeal, and the reports of independent physician advisors. According to Mr. Austin's letter, the determination to uphold the denial of benefits was made because Plaintiff's condition did not meet the Plan's definition of "total disability" with regard to STD.

///

///

///

**4. Procedural History of the Litigation in this Court**

Plaintiff filed this action in Yuba County Superior Court on April 17, 2007, and Defendants timely removed to this Court on May 24, 2007, pursuant to 28 U.S.C. § 1331.

On May 9, 2008, the Court issued a Pretrial Scheduling Order ("PTSO") stating, "This case will be governed by ERISA, therefore, all evidence for trial will be limited to the administrative record. The parties may move to admit evidence outside the administrative record." Additionally, the Court ordered that all dispositive motions were to be heard by December 8, 2008, and stated, "This Status Order will become final without further order of the Court unless objections are filed within seven (7) court days of service of this Order."

Plaintiff objected to the PTSO on grounds unrelated to the present Motions, and the Court subsequently issued an Amended PTSO leaving the aforementioned directives unchanged.

On October 28, 2008, citing calendar conflicts, the parties filed a Joint Stipulation to Extend Time for Hearings on Motions from December 8, 2008, to January 23, 2009, which this Court approved on October 30, 2008.

On November 26, 2008, Plaintiff propounded upon Defendants Interrogatories, Requests for Production of Documents, and a Notice to Take the Deposition of Defendants' Person Most Knowledgeable. Defendants objected to each discovery request on the grounds that evidence was limited to the administrative record, and, thus, on December 30, 2008, Plaintiff filed the instant Motion to Clarify or Amend the Pretrial Order.

14

Shortly thereafter, on January 9, 2009, Defendants filed their Motion for Summary Judgment.  Hearing on these Motions was scheduled on February 6, 2009, and both were submitted without oral argument.  The Court will now address each Motion in turn.

**ANALYSIS**

**I.    AMEND/CLARIFY PTSO**

Plaintiff seeks to clarify or amend the PTSO as to his ERISA claims to permit discovery and the admission of evidence outside of the administrative record.  According to Plaintiff, discovery is necessary to determine the existence of any conflicts of interest or procedural irregularities that would inform the standard of review applicable to, *inter alia*, Defendants' instant Motion for Summary Judgment.

To the extent Plaintiff seeks to clarify the PTSO, his Motion is denied.  The Court twice stated, "This case is governed by ERISA, therefore, all evidence for trial will be limited to the administrative record.  The parties may move to admit evidence outside the administrative record."  PTSO, 2:2-4; Amended PTSO, 1:25-27.  These limitations are unambiguous. Consequently, no further clarification is necessary.

Additionally, no good cause having been shown, Plaintiff's Motion to Amend the PTSO is denied as well.  The Court is normally required to enter a pretrial scheduling order within 120 days of the filing of the complaint.  Fed. R. Civ. P. 16(b).  The scheduling order "controls the subsequent course of the action" unless modified by the Court.  Fed. R. Civ. P. 16(e).

Orders entered before the final pretrial conference may be
modified upon a showing of "good cause."

Rule 16(b)'s "good cause" standard primarily considers the
diligence of the party seeking the amendment. <u>Johnson v. Mammoth
Recreations</u>, 975 F. 2d 604, 609 (9th Cir. 1992). The district
court may modify the pretrial schedule "if it cannot reasonably
be met despite the diligence of the party seeking the extension."
Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment);
<u>Id</u>. Moreover, carelessness is not compatible with a finding of
diligence and offers no reason for a grant of relief. <u>Id</u>.
Although the existence or degree of prejudice to the party
opposing the modification might supply additional reasons to deny
a motion, the focus of the inquiry is upon the moving party's
reasons for seeking modification. If that party was not
diligent, the inquiry should end. <u>Id</u>.

Plaintiff failed to exercise the requisite diligence in
seeking to amend the PTSO. While Plaintiff objected to the
original order on unrelated grounds, no further objections were
had, and the Amended PTSO became final seven court days following
service of the second order. Thus, Plaintiff twice relinquished
opportunities to object to the limiting provision, and also
failed, at any time prior to his December 30, 2008, Motion to
Clarify or Amend, to move to admit additional evidence.

///

///

///

///

///

Instead, Plaintiff waited until November 26, 2008, to begin to pursue discovery and then waited an additional month to file any motion before this Court. Notably, had the parties not stipulated to continue the December 8, 2008, deadline for hearing dispositive motions, Plaintiff's November and December discovery attempts would clearly have been untimely. Consequently, the Court finds that by waiting to pursue his current request until December 30, 2008, months after the issuance of the Amended PTSO and just shy of the continued motion hearing deadline, Plaintiff did not exercise the diligence necessary to now justify such amendment.

Furthermore, even if Plaintiff was able to show the requisite diligence, he makes only speculative claims that the additional evidence "will help the court determine what the test for review of the administrative record is, will help the court determine whether there are potential conflicts of interest, and may shed light on what is in the administrative record." Motion to Clarify/Amend, 4:6-10. Plaintiff further claims that "[t]he Motion for Summary Judgment raises several red flags of conflict of interest and bias which should be explored." Reply in Support of Motion to Clarify or Amend, 1:26-27.

Plaintiff specifically alleges that "[i]t is unknown whether the 'flat fee' [paid to Sedgwick] [was] significant enough to influence decision-making." Id., 2:3-4. Plaintiff also questions whether various supervisory relationships may have created conflicts and claims the independent medical reviews may be the result of bias.

///

Finally, Plaintiff contends that additional discovery might evidence whether Defendants properly filed the bylaws and regulations adopted for the enforcement of the plan. Plaintiff's speculation is simply insufficient to justify amendment of the PTSO at this time.[3] Thus, Plaintiff's Motion to Clarify or Amend is hereby denied.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment, or in the alternative, summary adjudication, as to each of Plaintiff's causes of action. In evaluating Defendants' Motion, the Court will determine whether Sedgwick abused its discretion when it upheld the denial of Plaintiff's claim for STD benefits, whether Plaintiff's state law claims are preempted by ERISA, and whether Plaintiff is barred from seeking extra-contractual damages in an ERISA case.

---

[3] See Gough v. Pacific Telesis Group Comprehensive Disability Benefits Plan, 2007 WL 4531695, *1 (E.D. Cal. 2007) ("There is no evidence that any exercise of discretion in the decision-making process below was tainted by a conflict of interest. Plaintiff's arguments in this regard are purely speculative. Therefore, Plaintiff's request for additional discovery regarding potential conflicts of interest is denied."); see also Bartholomew v. UNUM Life Insurance Co., 579 F. Supp. 2d 1339, 1342 (W.D. Wash. 2008)("Further damaging Plaintiff's position here is that in the final analysis her discovery request is little more than a fishing expedition. There are no allegations of actual conflicts or irregularities in her proceedings, and Plaintiff's position boils down to 'because Abatie permits the court to consider information outside the record if there is evidence of conflict of interest, I should be permitted to engage in wide-ranging discovery to find evidence of such a conflict.' This is an unwarranted expansion of the Abatie rationale, and Plaintiff presents no case support for it. Furthermore, the request flies in the face of the principles of streamlining and efficiency that underlie the ERISA statutory scheme.").

**A. Whether Sedgwick Abused Its Discretion in Denying Plaintiff's Claim for STD Benefits**

"A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the Plan for an abuse of discretion. However, in order for the abuse of discretion standard to apply, the Plan must unambiguously grant discretion." Frost v. Metropolitan Life Ins. Co., 470 F. Supp. 2d 1101, 1107 (C.D. Cal. 2007) (internal quotations and citations omitted).

In this case, it is undisputed that the Plan unambiguously vests discretionary authority in the Claims Administrator such that application of the abuse of discretion standard is appropriate. However, the existence of a conflict of interest or procedural irregularity may alter the lens through which the Court evaluates the instant decision to deny benefits. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 970-971 (9th Cir. 2006).

As previously discussed, Plaintiff's supposition that there may have been either a conflict or procedural irregularity is merely speculative. Indeed, the record is devoid of facts supporting the conclusion that a conflict of interest informed the decision-making in this case.

///

Furthermore, the Court is able to discern from Plaintiff's interpretation of the relevant facts the potential existence of only two alleged procedural irregularities.[4]  Specifically, Plaintiff's Opposition can be construed to allege: 1) that Defendants' ultimate decision to uphold the denial of STD benefits was based on reasons not provided in the original August 30, 2006, denial; and 2) that Sedgwick did not provide him with unambiguous notice of the reasons for the August decision.

First, Plaintiff appears to argue that he was initially denied benefits for failing to timely provide medical records, but that the decision to uphold the denial of his claim was based on a subsequent determination that he was no longer totally disabled.  "When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures."  Abatie, 458 F.3d at 974.  However, in his August 30, 2006, correspondence, Mr. Rountree made clear that, based on the records in Plaintiff's file, Plaintiff was no longer considered totally disabled under the Plan.  Plaintiff was thereafter put on notice that specific medical information establishing his disabled status was required, and that requirement remained consistent throughout the duration of his appeal.

///

---

[4] In arguing that the denial of benefits was unfair or unjust, Plaintiff seems to have stumbled upon potential legal arguments, despite his complete failure to cite to any applicable legal authority in his Opposition.

Therefore, this Court finds that Plaintiff's STD benefits were denied both in August, 2006, and January, 2007, because the QRU determined the evidence in the record did not support a finding that he was "totally disabled" as required by the Plan.

Plaintiff next argues that the TPA's August denial letter and its subsequent correspondence were ambiguous, making it impossible for Plaintiff to determine whether his claim was denied because he was untimely in submitting medical records or because the medical records were insufficient. "If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it." Booton v. Lockheed Medical Ben. Plan, 110 F.3d 1461, 1463 (9th Cir. 1997). "[A] meaningful dialogue between ERISA plan administrators and their beneficiaries" is required. Id. Sedgwick here made numerous attempts to engage in such a dialogue.

In his August letter Mr. Rountree stated, in pertinent part, "Please be advised that after a careful and thorough review of your request for further payment of short term disability benefits under the AT&T Disability Income Plan, it has been determined that your claim does not qualify for payment. As a result, benefits are denied effective 8/28/06 through your return to work date." AR 0222.

///

///

///

Mr. Rountree then provided the Plan definition of "Total Disability" and confirmed that he had received information evidencing Plaintiff's total disability through the period ending August 27, but had yet to receive any information indicating Plaintiff remained so disabled thereafter.  Finally, Mr. Rountree further advised Plaintiff:

> In order to determine ongoing disability, AT&T Integrated Disability Service Center will need clear medical evidence that supports a severe functional impairment or limitation that would give credence to your functional inability to perform your job or alternate job duties available to you.  This information may be included in the following: chart or progress notes, specialist's evaluations, physical therapy notes, diagnostic test results, operative report(s), or any other medical information you feel supports your inability to work.

AR 0223.

Accordingly, this Court finds that Mr. Rountree's communication clearly stated the reason for denial of Plaintiff's benefits, specifically that the record did not support the finding that Plaintiff remained "totally disabled."

This Court's conclusion is bolstered by the fact that, prior to issuance of the August denial letter, Plaintiff was already on notice that his claim had been approved only through August 23. Indeed, Plaintiff had received written correspondence to that effect, and, before his claim was formerly denied, Mr. Rountree made numerous additional attempts to reach both Plaintiff and Plaintiff's treating physician to allow them to supplement the record.  Only when no such evidence was forthcoming, did Mr. Rountree deny Plaintiff's claim.

///

///

22

1  Plaintiff subsequently submitted additional information to
2  Mr. Rountree on several occasions in September and October.  Each
3  time, Mr. Rountree notified Plaintiff that the after-filed
4  information did not change his decision, and that, should
5  Plaintiff wish to have that information considered, he needed to
6  file an appeal with the QRU.

7  After Plaintiff finally filed his appeal, Mr. Austin, from
8  the QRU, also contacted Plaintiff's counsel on numerous occasions
9  to inquire as to whether Plaintiff would be submitting additional
10 medical information.  Plaintiff was also given the opportunity to
11 toll his appeal while he gathered such evidence, but he
12 affirmatively rejected such an option, choosing to submit his
13 claim on the existing record instead.[5]

14 This Court finds the above correspondence sufficient to
15 qualify as meaningful dialogue.  Consequently, no procedural
16 irregularity will affect the applicable standard of review, and
17 the Court will review the denial of Plaintiff's claim for an
18 abuse of discretion, affording great deference to the decision of
19 the Claims Administrator.

20 ///
21 ///
22 ///
23 ///
24

25   [5] Plaintiff contends he would have chosen differently had he
26 been privy to the evaluations of Sedgwick's independent medical
   advisors.  However, as discussed below, Sedgwick operated well
27 within its discretion to seek medical review of the record before
   reaching its conclusion to uphold denial of benefits, and
28 Plaintiff was not legally entitled to review those documents
   prior to a decision being rendered.

23

"An ERISA fiduciary is obligated to guard the assets of the Plan from improper claims, as well as to pay legitimate claims. [The] deferential [abuse of discretion] standard of review furthers a primary goal of ERISA, which endeavors to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005) (internal citations and quotations omitted). Thus, "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Id. (internal citations and quotations omitted).

### 1. Defendants Did Not Render a Decision Without Explanation

Plaintiff does not argue that his claim was denied without reason. To the extent Plaintiff claims ambiguity in the communications he received during the claim and appeal process, his argument has already been rejected. Thus, this Court finds that Sedgwick did not abuse its discretion by rendering a decision without explanation in either its August 30, 2006, or January 3, 2007, correspondence.

///
///
///
///
///

**2. Defendants Did Not Construe the Plan in a Manner that Conflicts with its Plain Language**

Plaintiff's Opposition can feasibly be construed to make two arguments regarding Defendants' allegedly improper interpretation of the Plan. First, Plaintiff appears to argue that, absent appropriate notice to him, Defendants improperly relied on a lack of objective findings in the record to deny him STD benefits. Plaintiff also contends that, contrary to Plan requirements, Sedgwick failed to allow him adequate opportunity to rebut the conclusions of its independent medical advisors.

To the extent Plaintiff argues that Sedgwick acted contrary to the plain language of the Plan by denying Plaintiff's claim for STD benefits due, in part, to a lack of objective findings indicating his inability to work, his argument must fail. Sedgwick did not evaluate the evidence in the record in a manner contrary to the Plan terms.

"ERISA rules of construction govern the interpretation of the term 'total disability.' Accordingly, the burden of proof is on the insured to show that [he] is totally disabled under the Policy definition." <u>Seleine v. Fluor Corp. Long-Term Disability Plan</u>, --- F. Supp. 2d ----, 2009 WL 377131, at *10 (C.D. Cal.). Because the Plan defines "total disability" as an illness or injury coupled with a consequent inability to work, Plaintiff's burden here encompasses two distinct prongs.

///

///

///

///

Typically, "[a] plan administrator cannot exclude a claim for lack of objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate layman plaintiff's objectively reasonable expectations of coverage." <u>Moody v. Liberty Life Assurance Co. of Boston</u>, --- F. Supp. 2d ----, 2009 WL 192889, at *7 (N.D. Cal.) (internal citations and quotations omitted). Nevertheless, "an administrator is not prohibited from taking into account the fact that there is a lack of objective evidence."[6] <u>Id</u>. Furthermore, "numerous Courts have concluded that an administrator does not abuse its discretion by requiring objective evidence of an inability to function in the workplace." <u>Seleine</u>, 2009 WL 377131 at *12 (citations omitted). Accordingly, this Court holds that Sedgwick operated well within the discretion granted to it under the Plan when it based denial of Plaintiff's claim, at least in part, on a lack of objective evidence supporting his claim of his total disability.

Plaintiff's related argument that the TPA failed to provide him proper notice of its intent to rely on objective findings, or a lack thereof, similarly fails. Sedgwick notified Plaintiff on numerous occasions that additional evidence of his continued disability was required.

///

---

[6] Accurately described, Sedgwick in this case merely took into account the fact that the record was devoid of objective evidence <u>supporting</u> Plaintiff's disabled status. In fact, objective evidence did exist, but that evidence pointed toward a finding that Plaintiff was capable of returning to work. Thus, it was quite proper for the TPA to consider the lack of any contradictory objective evidence in reaching its conclusion.

First, the Plan itself provided Plaintiff notice that his claim must be medically substantiated and that he was required to submit evidence supporting that claim. <u>See</u> Plan § 2.12 (injury defined as "job and non-job related trauma or damage to the physical person of an Employee medically substantiated and treated by a Physician which renders an Employee incapacitated..."); <u>see also</u> Plan § 7.1 ("Employees shall provide the Claims Administrator, the Plan Administrator, and/or the Participating Company with such information and evidence, and shall sign such documents, as reasonably may be requested from time to time, for the purpose of administration of the Plan.").

Furthermore, in the very first correspondence from IDSC to Mr. Alvis, the TPA representative stated, "To qualify for benefit payments under the AT&T disability plans, your medical condition should involve a sickness or injury, supported by medical documentation that prevents you from performing the duties of your job with or without reasonable accommodations." AR 0095.

In that letter, IDSC further informed Mr. Alvis as follows:

> It is your responsibility to sign the Authorization to Release Medical Information form and to provide that authorization form with the Instructions to the Physician, the Initial Physician Statement and the enclosed self-addressed envelope to your physician. It is important that both you and your treatment provider understand that these forms, along with chart notes, diagnostic test results, hospital summaries, etc. specifically related to the reason of your absence should be returned regardless of the length of your disability. It is critical that your physician demonstrates by his/her observations and clinical findings that you are unable to perform your work with or without accommodations. This is the information, which will allow the case manager to make a determination of your eligibility for benefit payments under the AT&T Disability Plans.

...

> If the medical documentation received from your
> treatment provider does not contain information that
> establishes that your condition prevents you from
> performing the duties of your job with or without
> reasonable accommodations, your claim will not qualify
> for benefit payments under the AT&T disability plans.

AR 0095-0096.

Numerous of Defendants' subsequent communications to Plaintiff, including the August 30 denial of benefits dated, also contained instructions that "[i]n order to determine ongoing disability, AT&T Integrated Disability Service Center will need clear medical evidence that supports a severe functional impairment or limitation that would give credence to your functional inability to perform your job or alternate job duties available to you. This information may be included in the following: chart or progress notes, specialist's evaluations, physical therapy notes, diagnostic test results, operative report(s), or any other medical information you feel supports your inability to work." AR 0223. Thus, on multiple occasions, Plaintiff received actual notice that further approval of benefits was contingent upon the provision of evidence sufficiently supporting his treating physician's conclusion that Plaintiff was physically unable to work. Any attempt to argue otherwise is rejected, and this Court finds Sedgwick did not improperly interpret applicable evidentiary requirements contrary to Plan provisions.

///
///
///
///

Plaintiff finally challenges, as contrary to the terms of the Plan, his inability during the appeal process, to rebut the conclusions of Defendants' independent medical advisors. Plaintiff's argument is based on the premise that, after he determined not to submit any further evidence, Defendants continued to supplement the administrative record without notice to him.  Plaintiff bases his argument on Plan language stating:

> Upon the written request of a claimant or his duly authorized representative, received by the Committee or the Claims Administrator or the subcommittee to whom claim review authority has been assigned not more than sixty (60) days after the date of mailing or delivery of written notice of denial of such claim, the Committee or the Claims Administrator or the delegated subcommittee, as applicable, is required to give such claimant or his authorized representative a full and fair review of the claim, the opportunity to review pertinent documents, and the opportunity to submit to the Committee or the Claims Administrator or the delegated subcommittee, as applicable, issues and comments in writing.  Plan § 5.5.2(a).

According to Plaintiff, he was not afforded the opportunity to review pertinent documents because he was not provided the independent physicians' reports prior to the QRU rendering its decision.  Plaintiff's argument must fail.

In Silver v. Executive Car Leasing Long-Term Disability Plan, a plaintiff similarly argued that the administrator "unfairly kept the record open for itself after closing the record to him." 466 F.3d 727, 732 n.2 (9th Cir. 2006).  The Ninth Circuit stated:

///

///

///

///

29

> [T]here is no other way that [the administrator] could have addressed [the claimant's] appeal except by waiting until he had submitted all of his material. Simply put, in order for [the administrator] to evaluate [the claimant's] administrative appeal fairly, it *had* to wait until [the claimant] had submitted all of his materials; for [the administrator] to do otherwise would either undermine [the claimant's] ability to present all of his supporting information or lead to an interminable back-and-forth between the plan administrator and the claimant. Further, the paperwork generated by [the administrator] in the course of its review was fully disclosed to [the claimant] during trial at the district court, at which point [the claimant] had ample opportunity to respond.

Id. (emphasis in original). Plaintiff cites no contrary authority supporting his proposition that Defendants were required to provide their independent reviewing physician's reports to Plaintiff prior to rendering the decision on his appeal.[7]

Plaintiff likewise points to no authority, and no logical interpretation of the Plan, supporting a more general conclusion that, since a copy of his file had previously been provided to him, Defendants were required to send him each and every additional entry or document generated during the ongoing claims review.

///

///

///

///

_____

[7] Plaintiff also implies that the TPA's physicians should have examined Plaintiff or sought additional information from Plaintiff's physician. However, "there is no statutory or other requirement that [the Claims Administrator's] consultants must examine Plaintiff or consult with Plaintiff's treating physicians prior to rendering their opinions." Frost, 470 F. Supp. 2d. at 1108.

30

Not only would that be impractical, but, under the terms of the

Plan and as Plaintiff was informed throughout the process,

Plaintiff was himself required to request pertinent documents,

and was not entitled to assume Defendants would automatically

update him on any regular basis.[8]  Accordingly, for the above

reasons, the Court finds that Sedgwick did not improperly

supplement the administrative record contrary to the terms of the

Plan.

Thus, all arguments that Sedgwick construed the Plan in a

manner that conflicted with its plain language are rejected, and

the Court finds no abuse of discretion on this ground.

### 3.  Defendants Did Not Deny Plaintiff's Claim for Benefits Based on Clearly Erroneous Findings of Fact

The crux of the parties' dispute ultimately turns on the

determination of whether the TPA's decision was clearly

erroneous.  "Trust principles make a deferential standard of

review appropriate when a trustee exercises discretionary

authority."

///

---

[8] On numerous occasions, Plaintiff was provided actual notice that the administrative record could be supplemented after the date a copy was issued to him.  Specifically, in his August 30, 2006, letter, and those issued thereafter, Mr. Rountree stated, "You shall be provided, upon written request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.  ¶ 'Please note that your file may be supplemented after we respond to your request for relevant documents and such further information will be provided to you upon your future request(s).'" AR 0223.

Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d
869, 879 (9th Cir. 2004), quoting Firestone Tire and Rubber Co.
v. Bruch, 489 U.S. 101, 111 (1989). "Deferential review, of
course, does not mean no review. If the administrator's decision
is arbitrary,...the administrator's decision fails the 'fair
review' requirement of the statute. But as long as the record
demonstrates that there is a reasonable basis for concluding that
the medical condition was not disabling, the decision cannot be
characterized as arbitrary, and [the Court] must defer to the
decision of the plan administrator." Id.

In Jordan, as here, "[t]he administrator...had conflicting
reports from [Plaintiff's] treating physician and [Defendants']
reviewing physicians. This is typical of the evidence used in
disability determinations. Reasonable people can disagree on
whether [Plaintiff] was 'disabled' for purposes of the ERISA
plan. Because that is so, the administrator cannot be
characterized as acting arbitrarily in taking the view that [he]
was not." Id. at 880.

"Without taking upon [itself] the judgment of [Plaintiff's]
disability, [the Court] must nonetheless look to the record to
determine whether there is a reasonable basis for the
administrator's conclusion that [Plaintiff] was not disabled."
Id. "A finding is clearly erroneous when although there is
evidence to support it, the reviewing body on the entire evidence
is left with the definite and firm conviction that a mistake has
been committed. [The Court] will uphold the decision of an ERISA
plan administrator 'if it is based upon a reasonable
interpretation of the plan's terms and was made in good faith.'"

32

Boyd, 410 F.3d at 1178, quoting Estate of Shockley v. Alyeska Pipeline Serv. Co., 130 F.3d 403, 405 (9th Cir. 1997). Based on the evidence before it, this Court is left with no conviction that a mistake was made here.

First, as a threshold matter, Plaintiff never makes the claim that no reasonable basis exists to support Sedgwick's decision. Instead, Plaintiff simply seems to seek *de novo* review of a benefits determination with which he disagrees. Plaintiff argues that:

> It is noted that Plaintiff first went off work with substantial symptoms of pain. His original x-ray was negative. However upon appropriate further testing, it was established that there was not only good reason for the pain, but a surgical lesion that could be helped. Thus, the pain that Plaintiff was complaining of had been born out by objective tests. The Plaintiff's complaints of pain which were subjective were verified by objective evidence. Further, the applicant had objective evidence showing the need for surgery including neurological changes, weakness, numbness, and radicular pain. There is nothing in the record to reflect that the applicant was feigning an illness or genuinely did not suffer the pain described.
>
> ...
>
> [F]urther close review of the medical reports used to decide the appeal reflect that they were not objective and omitted significant findings. This was a repeat surgery or second surgery at the same level, which means more scar tissue and a much higher risk for increasing long-term pain and a failed back syndrome.

Opposition, 4:20-5:17. According to this and Plaintiff's other arguments, he disagrees with the evaluations performed by the independent medical advisors and the decision reached by the QRU. Nevertheless, as stated above, even if reasonable people could disagree as to whether Plaintiff was disabled, such disagreement is insufficient to constitute an abuse of discretion.

33

Notably, in reaching his conclusion as to his own level of disability, Plaintiff relies primarily on those portions of the administrative record that Defendants actually used to originally grant Plaintiff's claim through most of 2006. However, the issue before the IDSC and the QRU on August 30, 2006, and thereafter, was not whether Plaintiff had been injured at some prior time. Rather, after the approval of Plaintiff's benefits claim expired at the end of August, both the IDSC and the QRU reviewed the record to determine whether Plaintiff had adequately supported his claim that he continued to remain so disabled. Both units determined he had not. While the prior reports are informative as to the injury Plaintiff originally sustained, they are not indicative of his capabilities at the end of August.

To the contrary, though "[t]he medical information indicated that [Plaintiff] received treatment for back pain with radiation status post diskectomy," the QRU apparently relied more heavily on other evidence, such as later evaluations, that concluded none of the documented findings were "so severe as to prevent [Plaintiff] from performing the duties of [his] job...with or without reasonable accommodation from August 28, 2006 through to [his] return to work." AR 0403-0404.

Similarly, while the QRU was privy to post-surgery subjective physical complaints Plaintiff made to his treating physician, it also had before it additional documentation indicating that, on August 22, 2006, Plaintiff's straight leg raise test was negative with good strength.

///

///

He had residual pain in his lower back that Sedgwick's medical examiner determined was "insignificant since he [was] over all definitely improved and therapy was put on hold."  AR 0282. Plaintiff had no documented loss of function and both his back and leg pain were remitted.  Thus, not only were objective findings of total disability lacking, but the clinical evidence in the record actually indicated, *inter alia*, that Plaintiff had "documented normal neurologic status with no evidence of recurrent radiculopathy."  AR 0285.  Accordingly, while Plaintiff did claim to continue to experience some pain, Sedgwick operated well within its grant of discretion to reasonably weigh the evidence and to reach a conclusion that Plaintiff was no longer disabled.

Consistent with its conviction that there was no abuse of discretion by the Claims Administrator, the Court is compelled to point out that, to a great extent, Plaintiff's current claims boil down to an expression of his disagreement with the TPA's refusal to afford greater deference to his treating physician's conclusions regarding his level of disability than to other evidence.  However, Plaintiff's position is contrary to the law.

"Plan administrators...may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But...courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."

<u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003).
In fact "[u]nder ERISA, an administrator is not free to accept a
conclusion in a medical report without considering whether that
conclusion follows logically from the underlying medical
evidence...[a claims administrator is] duty bound to conduct its
independent investigation of [Plaintiff's] disability claim."
<u>Seleine</u>, 2009 WL 377131 at *12.

In this case, based in part on the evaluations of the
independent medical examiners, the Claims Administrator
determined that the conclusion reached by Plaintiff's treating
physician was not supported by the objective findings.  The
Claims Administrator appropriately refused to accept such a
conclusion without independently examining the underlying
evidence.  It was not only proper, but necessary in order to
fulfill its obligations, for the TPA to do so.

Finally, it is of no small import that the records of
Plaintiff's treating physician on which Plaintiff would have the
TPA rely are largely no more than a reiteration of Plaintiff's
subjective complaints.  Plaintiff's allegations are not medical
"findings."  See Id. ("[Plaintiff's] attempts to elevate these
notes of a patient's self-report to the status of "findings" is
inappropriate.  Doctors have an affirmative obligation to record
the symptoms complained of by their patients...[T]hese complaints
were subject to verification by objective medical evidence. [The
Administrator] was under no obligation to accept them at face
value.").  Thus, the QRU was not required to accept Plaintiff's
own description of his pain or limitation as binding.
///

Quite the opposite, Defendants were under an obligation to provide full and fair review of Plaintiff's claims, which included enlisting the advice of independent physicians to evaluate all of the evidence in the record.

In conclusion, though Plaintiff may have a plausible argument that reasonable people could disagree as to whether or not he was "totally disabled" in August 2006, that is not the standard by which this Court is bound. Instead, this Court finds the denial of benefits in this case was based on a good faith and reasonable interpretation of the evidence. Thus, Sedgwick did not abuse its discretion.

In sum, the record simply does not support the conclusion that Defendants "rendered a decision without explanation, construed provisions of the plan in a way that conflicts with the plain language of the plan, or relied on clearly erroneous findings of fact." Consequently, Defendants' Motion for Summary Judgment as to Plaintiff's ERISA claims is granted.

**B.    Whether Plaintiff's Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Are Preempted by ERISA**

Defendants argue that Plaintiff's common law claims cannot survive the instant Motion because those claims are preempted by ERISA.[9]

///

[9] The Court's remaining discussion is subject to traditional summary judgment analysis. However, because only purely legal issues remain, no further elaboration on that legal standard is required.

Section 514(a) of ERISA provides, "Except as provided in
subsection (b) of this section, the provisions of this subchapter
and subchapter III of this chapter shall supersede any and all
State laws insofar as they may now or hereafter relate to any
employee benefit plan described in section 1003(a) of this title
and not exempt under section 1003(b) of this title."  29 U.S.C.
§ 1144(a).  To the extent Plaintiff raises breach of contract or
tort claims in his First Amended Complaint, it is undisputed that
those claims are preempted by ERISA because they "relate to" an
employee benefit plan.  See Pilot Life Ins. Co. v. Dedeaux, 481
U.S. 41, 48 (1987) (noting that "[t]he common law causes of
action raised in [plaintiff's] complaint, each based on alleged
improper processing of a claim for benefits under an employee
benefit plan, undoubtedly meet the criteria for pre-emption under
§ 514(a)."), overruled on other grounds by Kentucky Ass'n of
Health Plans, Inc. v. Miller, 538 U.S. 329 (2003).  Accordingly,
Defendants' Motion for Summary Judgment as to Plaintiff's state
law claims is granted.

**C.     Whether Plaintiff is Barred from Seeking Extra-
         Contractual or Compensatory Damages in an ERISA case**

Defendants contend that Plaintiff is unable to recover
punitive damages or damages for emotional distress in this ERISA
action.  Because the Court has already disposed of all of
Plaintiff's causes of action, Defendants' Motion for Summary
Adjudication as to these remedies is denied as moot.

///

///

38

**CONCLUSION**

Plaintiff's Motion to Clarify or Amend the PTSO is DENIED. Defendants' Motion for Summary Judgment is GRANTED, and the Clerk of the Court is directed to close the file.

IT IS SO ORDERED.

Dated: April 14, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE